We'll now move to the last case in the argument today, United States v. PetroSaudi Oil Services, and I believe Mr. Sohn is going to be appearing via video, and is it Mr. Riley? Riley, you're on? Riley, sorry. Yes, non-phonetic. Okay. Mr. Riley, whenever you're ready. Thank you, Your Honor, and may it please the Court, I'm Richard Riley on behalf of the claimant. I'd like to reserve four minutes for rebuttal. This is a case of government overreach. DOJ seeks to use federal power to override English law and public policy within the United Kingdom's territory, and with respect to property it owns and controls. In these circumstances, DOJ's recourse was to utilize... Can I stop you right there? You say that the U.K. owns this? We do submit that, Your Honor, and it's in their jurisdiction. What's your evidence for that? Has there ever been any assertion of ownership by the U.K.? Custody is different from ownership, of course. I understand custody, although I'm not even sure we've got custody anymore, but ownership's a different question. That's true, Your Honor, and here we have established the predicates of ownership. In fact, we have more clarity on that than we used to because the accountant general has actually weighed in on that. At this court's docket 38, we have a statement submitted in the U.K. court by the accountant general of the United Kingdom specifically stating that under U.K. law, the property vests in the accountant general. The term vest is a term of property ownership under English law. We also have an assertion by a Queen's counsel, now King's counsel as an expert, establishing that under U.K. law, title vests in the accountant general's office. So that's what triggers the sovereign immunity argument. Even if the court were not to agree with us on that, that wouldn't change the prior exclusive jurisdiction doctrine. But I want to get back to the pragmatic dispute at the heart of this case, which is a disagreement that the Department of Justice has with English public policy in the form of maintenance payments, which are remittances from a raise within the custody of a U.K. court to secure the ability of a litigant that claims ownership in the property to fund an adequate legal defense. At paragraph 129 of the April 13th prohibition order, the high court expressly contemplates that those payments will be made. It contemplates. Have any of them been released yet? Since briefing closed, there was actually a release. The most recent district court docket items reference that. Department of Justice objected. And the parties, because of the chilling effect of the Central District of California's case, have agreed to submit that money back to the high court pending this court's adjudication of the merits. But the prohibition order is very clear. And, by the way, the National Crime Agency actually supports this because it is the public policy of the United Kingdom. You can see that at volume 3, excerpts of record, page 380. It is customary in the United Kingdom to do this.  Well, counsel, regardless of your characterization of what the government's disputing, your claim is that the entire race is outside our court's jurisdiction, not just things that might be released for maintenance or attorney's fees. Your claim is everything. That's correct, Your Honor. And you were also talking about the policy of the U.K. So even if there might be some dispute about the policy of the U.K. with regard to what's released for maintenance, as I read the prohibition order and the long order that accompanied it, the court in England was saying that we fully support the ability of us to sequester the money for the United States. Am I reading what the district court wrote, I mean what the high court wrote incorrectly? I think it's more tentative than that. And I think that for purposes of the legal doctrines here, we shouldn't have to be engaging in that level of analysis. Which legal doctrine, foreign sovereign immunity or this prior exclusive jurisdiction? Both. And let me actually start with the second, because the court has addressed a similar case in the Cadillac-Seville case, which involved dueling parallel in-rem proceedings with the state of California. And the court recognized in that case that the state of California didn't object to the federal proceeding. And in fact, it wasn't seeking the property from the federal government. And in fact, that proceeding appeared to be inactive. And this court held that that, that the prior exclusive jurisdiction rule is mechanical, unless there is a very clear abandonment of jurisdiction. Mechanical between the federal courts and a foreign court? That wasn't at issue in this case. Other courts, other circuits have held as much. The Third Circuit used that precise term in the daily versus national. Have we ever done that? You have not, Your Honor. But no court has reached a contract holding that would create a stark circuit split if this court were to reject the position of the Third Circuit, the D.C. Circuit, and the Second Circuit. But going back to the Cadillac-Seville case, what the court looked for was an affirmative abandonment of jurisdiction by the state court. It wasn't enough that it wasn't objecting. It wasn't enough that it wasn't putting up a fight. It needed abandonment of jurisdiction. And the April 13th order absolutely does not do that. It preserves the status quo. Most importantly, it takes the property so that my client can't get it, but it also says in paragraph 116 that the property is to be kept safe from the Department of Justice. It's not abandoning the property to the Department of Justice. It's not abandoning jurisdiction. It's not a waiver of prior exclusive jurisdiction. Back to sovereign immunity, we have a similar. Where do you see it saying it's meant to be kept safe from the Department of Justice? It's paragraph 116 of the prohibition order, Your Honor. Under the foreign sovereign immunity doctrine, we look for a clear statement rule for consent or waiver. And that clear statement rule requires something explicit from the foreign sovereign of intent to be bound by U.S. law and submission to the U.S. system. You don't see anything like that in the April 13th prohibition order. Again, what you see here is perfectly consistent with the sovereign taking control and asserting itself over the property. At the end of the day, it is the high court or some court in the United Kingdom that will decide what happens to this property. At the end of the day, the United States government will never get that property unless the high court gives it to them. Well, that's clearly true. I mean, we can issue all the orders we want, but if the money is still in the control of the court and the court isn't releasing it in a way that it could get to us, it really doesn't matter what we write. But that really doesn't inform the jurisdiction issue. I mean, as I read these orders, the government agency intervened in the high court proceedings in order to protect the United States' interest, expressing the view of the executive branch of the government. And the court, the judicial branch, said we're going to allow this intervention, and the district judge in the Central District of California seems to be proceeding in a very fair, even-handed manner. We reject any claims that the district court isn't proceeding fairly, and we're going to let them intervene, and we're going to protect this money so that if at an appropriate time the United States can get it, it can get it. So why isn't those statements by the high court and those statements by the U.K. executive, even if this prior exclusive jurisdiction were applicable here, why doesn't that get us past it, the statements by the two branches? It's not an abandonment of jurisdiction by the high court. All it means, if you step back and think about it, is that the government has had some measure of success in the English proceedings. Good for the government. That's where it's supposed to go to get relief from a foreign court. It also is supposed to live with the rulings that it gets. So if and when maintenance payments are released, it should live with those payments. What it's doing is using the Central District of California to override what's happening in the United Kingdom. So, counsel, your view is that 28 U.S.C. 1355A2, or B2 rather, is irrelevant? Yes, Your Honor. It establishes the DDC as another forum for a case like this. But the fact that it says in the statute, whenever property subject to forfeiture under the laws of the United States is located in a foreign country, et cetera, et cetera, et cetera, that the whenever we should read whenever is having caveats, even though it says whenever. What the court should read it as doing is incorporating any number of defenses that might be raised in the proceeding, just as this court did in the Nevada State Engineer case. I think there's two problems with the government's reliance on that. Sorry, in the Nevada State Engineer's case, was the money, and I just don't remember, or was the race located in a foreign country? It was a river case. A Nevada state court had jurisdiction over a water dispute. This statute says whenever property subject to forfeiture is located in a foreign country, whenever. So we should read whenever as like sometimes. Yes, and in that case, the U.S. submitted to jurisdiction in the court, and the court said even though it used the term jurisdiction, that doesn't mean there's not other defenses. It waived sovereign immunity. It didn't have effect of effectively making ruling in favor of that party on the merits. Let me say a couple things. There's two problems with the government. May I interrupt for just a minute? Are there any claimants to this fund other than the United States and your client? I don't believe in the Central District of California. There are, Your Honor. Are there any anywhere? Yes, the PDVSA has a proceeding in Paris to overturn the arbitration law. But they lost the money in the arbitration proceeding. Isn't that right? Yes, and they're appealing. There's a live appeal in Paris on this. The Malaysian government would like this money. But the award has been given pending the appeal. Is that what happened? It's a little more complicated than that. The award is in England, not in Paris, because that's where Clyde and Company was. The PDVSA actually went there to try to get the functional equivalent of a stay pending appeal from the English court. The English court said that that was improper, but it's still being held there. Let me back up so I understand. But the money that's been paid into the English court is the money that's come out of that arbitration. And you're saying that there's an appeal from that arbitration? Yes, Your Honor. I read that the U.K.'s April decision, High Court's decision, they were saying, regardless, we've held that that money is now Petra Saudi's. And Petra Saudi is keeping it with us on a purely voluntary basis. And their lawyers won't accept the money because they're concerned about the arrest warrant. The court had ruled that my client is entitled to the money as against PDVSA. The court rejected our position that we should actually get the money. We asked for that. We didn't get that relief. We got our alternative relief of going to the High Court. They rejected it, my understanding. The High Court rejected it because of the NCA's petition for the prohibition order. No, it rejected it long before the government sought a prohibition order in, like, nine months before the government sought the prohibition order. That's not why it did so. So, again, this is the complicated procedural history. My client filed the proceeding in the High Court to either obtain the money or move it to the court funds office against Clyde & Company. That was originally denied because of the risk to Clyde & Company from the arrest warrant. There was not a prohibition order proceeding at that time. The government waited a very long time, which is quite unusual, I think, and I think really the government's error in this case of not going and seeking that much earlier. Once the warrant was recalled, then the court granted the alternative relief of moving it over to the High Court funds office. Right, but the way I read the High Court's order, they said Petra Saudi was voluntarily keeping the money in the court's office. If voluntarily means you asked for it as your second best relief and got it, then I think that's accurate. I think it has to be read in the context of the complicated procedural case history. I do want to address very briefly, to get back to 1355, there's a very common occurrence, which I think is being referenced in that text, where the government itself goes abroad and gets a restraining order in aid of a U.S. court proceeding. In that circumstance, there wouldn't be a prior exclusive jurisdiction doctrine problem because it's an adjunct to the U.S. proceeding. There's not a conflict. That's the common scenario. It's not what we have here because we have that trust proceeding. If I may move briefly to the issue of personal jurisdiction. Yeah, counsel, on that, before you do, and we'll make sure you have enough time for your argument, this is not raised in the briefs, but a question that I have, the supplemental rule E8, which is part of your argument, starts off by saying an appearance to defend against an admiralty and maritime claim, et cetera. This obviously is not an admiralty and maritime claim, right? Correct, Your Honor. So, again, your friend in the United States has not raised this, and I don't think they raised it below either, but why is this rule applicable at all since it says an appearance to defend against an admiralty and maritime claim? The only case I've been able to find that explicitly discusses this is an SDNY district court case, which speaks against your position. But why is this rule applicable since this is not an admiralty and maritime claim, even though Rule E covers more than admiralty and maritime claims? I believe Supplemental Rule G incorporates it. I don't have the copy of the rules, but I believe Supplemental Rule G incorporates prior supplemental rules, which in turn incorporate the prior federal rules, which is actually where I want to start, which is 12H, which provides the general rule with which we're all familiar. An appearance in a court doesn't waive personal jurisdiction. The government appears to be arguing that Rule E8 carves out of that. I don't think that's correct at all. That provides additional protections. There's no conflict between the two. Our reliance is really on 12A, not on E8. I'm well into my rebuttal time, and I'd like to reserve it if it pleases the Court. All right. Thank you. I'm happy to answer. Okay. Thank you.  So first, Mr. Sohn, you can hear me? Yes, Your Honor. Judge Fletcher, you can hear me? I can, yes. Thank you. And Mr. Sohn, just to make sure, were you able to hear the Court's questions when your friend was arguing? Yes, Your Honor. All right. So why don't we put 20 minutes back on the clock, and why don't you just start from scratch? Thank you, Your Honor. May it please the Court, Joshua Sohn of the United States. To address foreign sovereign immunity first, the actions of the foreign sovereign here defeat Clayman's foreign sovereign immunity position. The U.K. Court, at the request of the NCA, granted a prohibition order with the express purpose of preserving the funds for this U.S. case. Counsel, I want to start with a more fundamental question with a case that, as far as I can tell, isn't cited in the briefs. Are you familiar with the Second Circuit case, United States v. ASSA? We are, Your Honor. All right. So as I understand the ASSA case, the Second Circuit held that there is no sovereign immunity in this kind of in rem action at all. Not under FSIA, not under the common law, there just is none. And apparently, in doing so, I assume that since the United States was a party, that it was accepting an argument made by the United States in that case. But regardless, is it the United States' position that the ASSA case is correct on this issue or not? Your Honor, I want to be very careful here because I certainly don't want to waive work product. We had to pick our arguments. And suffice it to say, there is some question among some litigating components of the Department about whether ASSA was perhaps overbroad, whether perhaps all its language was correct. So in an election of what arguments to make, we elected to not make that particular argument. Obviously, ASSA says what it says. If this court was persuaded by ASSA, obviously it could rule that way. But in electing which arguments to make, we chose not to make an argument that, again, to be as circumspect as possible, some litigating components of the Department might think has some language that they might take issue with. But obviously, ASSA is a jurisdictional case, and one can't waive a jurisdictional argument if we were to agree. Correct, Your Honor. All right. I understand your position. So certainly our front-line argument is that this U.K. prohibition order would make no sense. It would make no sense for the U.K. executive and the U.K. court to preserve the funds for this case if it felt that the funds were immune from this case. So the U.K. prohibition order, and frankly even the NCA's request thereof, can only be understood as either a waiver of sovereign immunity or a recognition that sovereign immunity never attached in the first place. How do you respond to the argument on the other side that the word vest is an expression of an assertion of ownership? So that, of course, was not – so first of all, that does not address waiver at all. You only would get to that question if you find there was no implicit waiver. And then you would address, okay, well, absent a waiver, are these funds sovereign U.K. government property? But to address Your Honor's question, the U.K. accountant general's submission is ambiguous about whether it's ownership or control that is vesting. It's also, frankly, unsurprising the U.K. accountant general itself might take a maximalist view of its own prerogatives. But when you look at what the U.K. courts have said, the Crumpler case is the most recent binding appellate U.K. authority. And it says that when money is paid into court, ownership doesn't change. It's only control that moves over to the U.K. accountant general. But before getting to that, with Your Honor's permission, I would like to circle back to waiver because that could be certainly a threshold way of disposing of this case. Under a waiver framework, this court held in Siderman that where the foreign sovereign through its actions contemplates the involvement of U.S. courts in the disputed issue, we will find an implicit waiver. In fact, you could see that rule actually applied in the negative in Clayman's own cited case of Barapin v. India, where at page 830, this court held that there was no implicit waiver because, quote, Barapin has not met his burden of proving that the Indian government contemplated the involvement of the courts of the United States. Well, here did the U.K. government contemplate the involvement of the courts of the United States? Of course it did. The U.K. High Court granted a prohibition order for the express purpose of preserving the funds for the U.S. case. The N.C.A. sought that prohibition order. Even before that, the N.C.A. served the district court's arrest warrant. Even before that, the N.C.A. crafted and tendered a witness statement, which we submitted on its behalf to the district court, saying we have no objection to the U.S. case proceeding. So, counsel, in other contexts, unrelated contexts, when we consider the issue of waiver, we often talk about for there to be waiver, there has to be an explicit statement by the waiver, waivor, that they know they're right and they are explicitly waiving it. And what would you propose here as the test for an implicit waiver of sovereign immunity by a sovereign foreign state? How would we judge whether there was an implicit waiver? Would there be a hearing that would be necessary by the district court? Would we decide it based on the record as a matter of law? What if there were disputed issues? I mean, what's the test for deciding imputed waiver of foreign sovereign immunity? Well, I believe both the district court and this court would decide it on the record, whatever the record consists of. But the standard is set forth in Stikerman, as well as cases like Joseph v. Nigeria, that side of the sites. And it's, again, did the foreign sovereign contemplate involvement of U.S. courts? So just contemplation, and if they contemplated it, that's enough? Well, obviously, you know, we can't get inside their heads. The contemplation has to be evidenced by some sort of action conduct statements. But here we have quite explicit statements. We have the U.K. court saying in the prohibition order, these funds may be necessary for a final forfeiture judgment that Judge Fisher may issue. And we're going to preserve them for that eventuality. So clearly, the U.K. court, in the most explicit terms, contemplates that the U.S. court will be, should be, may be adjudicating this all the way to forfeiture judgment. And I think Judge Bennett, I think Your Honor really hit the nail on the head with what happens after then. Because claimant has said, well, after the forfeiture judgment, there's no guarantee that it's going to be enforced. That's certainly true. The U.K. court didn't bind itself for what might happen in post-judgment proceedings. But certainly it contemplated that Judge Fisher should be allowed to reach a final judgment, a final forfeiture judgment in the U.S. proceedings. Because it preserved the funds for that very eventuality. So I think there can really, under this court's Ciderman standard, as well as, again, the standard that's echoed in cases like Barapin, this clearly constitutes an implicit waiver of sovereign immunity. Well, further, in order for there to be even a question as to whether or not there's a waiver of sovereign immunity, there has to be sovereign immunity in the first place. And there may never have been sovereign immunity in the first place, in which case we're looking in vain for a waiver. Well, that's right, Your Honor. That's why I think the actions of the U.K. government can either be read as a waiver of immunity or as a recognition. One could call it almost implicit evidence that immunity never existed. It would make no sense for the U.K. executive to seek and for the U.K. court to grant a prohibition order if the funds were immune from this U.S. case. Because why would you preserve it for a case, a U.S. case, if they're immune from the U.S. case? And, you know, as we cite, the U.K.-U.S. MLAP, the Mutual Legal Assistance Treaty, has expressed cargo, saying that the requested party need not provide any assistance at all if doing so would impair its sovereignty. But nonetheless, the NCAA has acted over and over and over again to facilitate this U.S. case by serving the district court's arrest warrant, by tendering a witness statement to the U.S. court saying it has no objection, and finally by seeking a domestic U.K. prohibition order to preserve the funds for this U.S. case. Judge Fletcher and the rest of the panel, I don't know if Your Honors would like a discussion of the U.K. case law on the Sherratt and the Crumpler cases, which really do suggest that this was never a U.K. government property at all. I'm happy to go into that, but I also don't want to take the Court's time if it does not wish discussion of that somewhat complex issue. I guess... I think you did, before you finish, in a discussion of the question how the federal district court in California has jurisdiction to assert ownership, to adjudicate interest in the funds. I mean, the funds are not located here, as far as I can tell, none of the events took place in California. How does the California district court have jurisdiction? So, Section 1355b2 states that when the arrest is located abroad or subject to a foreign restraint, the U.S. case may be brought in and basically any district or any acts or omissions giving rise to the forfeiture took place. And this Court held two years ago in the United States v. Obaid that that language is broad, and when the arrest proceeds of a conspiracy, effectively, any district where any acts in fervor of the conspiracy took place is a proper district for the forfeiture case to be brought. So, what's the petticoat act here? Well, in this case, this arrest is proceeds of a broad-ranging conspiracy to misappropriate money from the Malaysian sovereign wealth fund, 1MDB, and hundreds of millions of dollars were laundered into the Central District of California to purchase the L'Hermitage Hotel, to purchase other luxury property. One of the conspirators wrote a fraudulent email from Los Angeles, which was really the key to unlocking over $2 billion in stolen funds. So, under Obaid, because acts in fervor of the conspiracy took place in the Central District, this forfeiture case can be brought in the Central District. And, you know, indeed, Petro-Saudi has not raised a 12B3 improper venue, I'm arguing. I understand that. But, so to pivot back, I think there is a very serious question. In fact, we believe that these funds were not sovereign U.K. property at all, even beyond the inferences that can be gleaned from the fact that the U.K. court granted the prohibition order, the fact that the NCA sought the prohibition order. Claimant's argument for U.K. sovereign ownership, the sole appellate authority they cited was a single sentence from the 1985 Sherratt case from the U.K. Court of Appeal saying that a person who pays into court, quote, parts outright with that property. But as we pointed out just four years ago in Crumpler v. Candy, the U.K. Court of Appeals said that this precise Sherratt passage, the very sentence that claimant's expert relies on, likely only addresses control, not ownership. That it was dicta. That to the extent it did address ownership, it's out of step with the rest of the U.K. case law. And that we are not going to follow it. And in fact, the Crumpler court held that a party who had paid the money into the court retained the power to deed it over to a third party. Not only that, but the Crumpler case addressed a long body of U.K. case law where private parties fight out over entitlement to money paid into court. They cite, must be eight or ten cases. That case would make no sense if, as soon as money is paid into court, it becomes sovereign government property. Those private litigations would have been dead letters at the outset. So the fact that over and over again you see these U.K. private litigations fighting over entitlement to money in court shows that such money is not sovereign property cloaked with sovereign immunity. To pivot to prior exclusive jurisdiction, I think section 1355 really is dispositive. I know Judge Bennett quoted part of the statute. I actually think the part that was not quoted is even more powerful. It grants jurisdiction when the property, quote, has been detained or seized pursuant to legal process or competent authority of a foreign government. So it's saying when a foreign government has seized the property, just U.S. district courts have jurisdiction to hear forfeiture cases over that property. This is not merely a venue provision. It's a jurisdictional provision. This court has held it 1.67 million. And in 1.67 million, this court also applied that to uphold U.S. federal court jurisdiction over property that had previously been frozen by a Cayman Islands court. Now, claimant tries to distinguish 1.67 million by saying, well, in that case, the Cayman Islands court was acting as an agent of the U.S. But that is the very thing 1.67 million says you don't look at. The holding of 1.67 million is that U.S. forfeiture courts have jurisdiction over prior property, over foreign property, regardless of how cooperative the foreign government is or is not vis-a-vis the United States. Counsel, this may be in your brief, but what is the United States' position as to putting aside 1355 for a minute? Is there such a thing as prior exclusive jurisdiction when the two courts are a United States federal court and a foreign court? Does that exist? So that is in our brief, Your Honor. And our position is that certainly a U.S. court could defer adjudication to the foreign court, but it would do so as a matter of comedy. The heartland of prior exclusive jurisdiction is, of course, to adjudicate federalism-related tug-of-wars between state and federal courts. So at the minimum, when you're talking about international proceedings, you're taking it way outside its traditional heartland. So the United States' position is that vis-a-vis federal and state courts, it's more than just a matter of comedy and or discretion, but when it comes to a foreign court, that the test is much more discretionary? Is that a fair characterization? It is. In domestic proceedings, this court has held as a matter of binding circuit law that it is a mechanical, non-discretionary doctrine when applied as part of federal and state proceedings. Who's first? What's that? You figure out who's first. You figure out who's first according to the PENGEN test for who's first. Even for it to apply as a matter of comedy or discretion or judgment, you need to have some sort of an in-rem proceeding going on in the foreign jurisdiction. As far as I can tell, there's no in-rem proceeding going on in the U.K. Well, claimant has argued that the U.K. proceedings are effectively in-rem. Why is that so? Well, because they say that the rest was paid into court. But that's purely custody. That doesn't mean there's a proceeding going on. Yes, I think certainly the U.K. proceeding is styled NCA v. Petro-Saudi Oil Services, Venezuela. So there is a question whether it is an in-rem proceeding, but even if it was, there are multiple reasons why prior exclusive jurisdiction does not bar this U.S. case. 1355, what I addressed, is one reason. The fact that the Cadillac Seville case cited by claimant says the purpose of the doctrine is comedy between courts. So at minimum, when you're going to apply it outside its federal state heartland to international proceedings, you should be guided by a comedy analysis. And we cite a detail law in a case brought by the U.S. government with the support of the U.K. government, with the support of the Malaysian government, with the support of the U.K. court. There is really no comedy-based reason to abstain from adjudicating this case. But finally, even if the doctrine did apply, Tengen has priority rules that the Supreme Court set forth in that case. And it says that when jurisdiction is concurrent and the two cases have substantially the same purpose, the court that first receives a complaint gets priority. And here, there's no dispute that this case, this court was the first to receive a complaint. We filed this case in September 2020. The U.K. proceedings didn't begin until November 2020. Now, claimant says, well, these two cases don't have the same purpose. But that's really not true. If you look at how Tengen applies its rule, in Tengen itself, the federal proceedings were a shareholder derivative suit, private litigation. The state proceedings were essentially a nuisance proceeding, a public nuisance proceeding to condemn the subject business as a public hazard. So very different bodies of law, just as the U.K. and U.S. cases are different bodies of law. But they have the same basic purpose, to decide, adjudicate disposition of the corporate property. And that was enough to trigger the date of complaint priority rule. And the same should be true here. In my final minute to move to the personal jurisdiction arguments, multiple circuits have held that an in-rem court has the power to protect the rest against the world at large and to enforce that through injunctive relief. The Alderwood case from the 11th Circuit, the Hall case from the 5th Circuit, the Wanky case from this circuit that cites and relies on Hall statements about in-rem jurisdictions that preserve a court's ability to render judgment. So in this true in-rem proceeding, we believe that the district court certainly had the power to enjoin anyone from dissipating and disturbing the rest. But even if this court were to take a more narrow view, certainly this court has the power, excuse me, the district court had the power to enjoin destructive actions by a party to the case. When claimant enters this case and voluntarily chooses to participate in this case, it is subject to coercive actions of the district court to preserve the rest. In my final second, claimant alluded to bankruptcy law in its recent Rule 28J letter. So I would refer this case to the court to Inglis Simon, where this court held that in an in-rem bankruptcy case, a district court certainly has the power to enjoin parties to the case from disturbing the rest. Thank you, counsel. And that is 150, I'm sorry. No, you can conclude. I was just saying that the citation for Inglis Simon is 153 F3D 990. Thank you. Do either of my colleagues have any further questions? All right. Counsel, we'll give you five minutes. Appreciate it, Your Honor. A few rebuttal points. First off, I did confirm that Supplemental Rule G incorporates Supplemental Rule E. Thank you. Second, I think it's very critical to recall that the government has placed almost all of its reliance on an order in a court proceeding that is not final. We are seeking leave to appeal, and it would be improper for the court to issue a ruling predicated on that order, only to find out later that it does not withstand appellate review. Third, I want to go back to the point... I'm sorry, are you referring to the U.K. decision? That's correct, Your Honor. Third, I want to go to Judge Fletcher's question about jurisdiction in this case. What my friend, Mr. Son, neglected to mention in addressing that is that to achieve jurisdiction, it's not enough that 1355 be satisfied. An arrest warrant also has to be served on the property, and that has not happened here. That on its own is a fundamental jurisdictional deficiency in the district courts. Proceeding on its own would necessitate reversal, unless the government is correct in its only argument on this point, which is that an exception applies by virtue of the April 13th prohibition order that did not come into effect until this appeal had not only been filed, but our opening brief had been submitted. That is not how the rule reads. So that on its own is a deficiency in jurisdiction and would defeat this case in its entirety. I want to go back to what I think is a point of agreement, if nothing else in this case, which is that only if the United Kingdom court ultimately hands over the property will relief be afforded in this case. That just gets back to the fundamental problem here. This is an in rem case. In an in personam case, it's certainly proper to say we'll worry about collection later, but here we're proceeding against the property at the outset. The prior exclusive jurisdiction rule in particular, as well as the warrant requirement, ensure that this case has a proper in rem character. It does not. We're ultimately left with the graces of the United Kingdom court to get any effective relief in this case. Next, the question of personal jurisdiction. Mr. Son has made a very broad argument that in rem jurisdiction authorizes in personam relief against the entire world. The cases that are cited, including the Hall case, don't deal with the question that's at issue here. They deal with the authority of a court to issue an injunction. Where does that authority come from? Here, that's not in dispute because 983J provides that authority. There's a statutory authority to do that. We don't have to look to some kind of inherent power that might be adjunct to an in rem case. The problem here is different. It's constitutional. When the order operates on persons who lack the minimum contacts with the United States, that is an impingement of Fifth Amendment due process rights. It's operating in personam. The injunction here actually names my client as a person subject to the injunction. The power of the district court to declare legal title to property does not carry with it the power to give relief around the world with respect to that property. The narrower argument that Mr. Son raises about waiver finds no support in the bankruptcy context. He cites a bankruptcy case. It's true in the bankruptcy context that it has been held that where a claimant comes into court and submits a claim, that person then is subject to the personal jurisdiction of the court for purposes of injunctions. But that's because in those cases, the claim is going on offense. It's submitting a claim, which is effectively a debt collection effort against the debtor. When you go on offense, you submit yourself to defensive measures and counterclaims. But as the Tenth Circuit held in the 51 pieces of real property case, the claimant in the forfeiture case is on defense. The claimant has no choice but to appear and try to defend the property. Finally, the obeyed case, I think, supports us in this regard for two reasons. First, it holds that the jurisdiction here is in rem. It would make no sense to say that in submitting to an in rem jurisdiction, you're waiving personal jurisdiction. And also in that case, the claimant did appear. What was the point of litigating personal jurisdiction if it was waived? Thank you, Your Honors. All right. We thank both counsel for their arguments. The case just argued will be submitted. And with that, we are adjourned for the day. All rise.
judges: FLETCHER, BENNETT, SUNG